Good morning. I'm Melanie Pearson, Assistant U.S. Attorney from the Southern District of California, appearing on behalf of the United States. We're here because in July of 2007, after six weeks of trial, thousands of pages of briefings, a jury convicted of San Diego Gas and Electric of mishandling nine miles of asbestos piping during the demolition of the Acanto Gas Holder facility and lying to the government about the qualifications of its expert. The district court overturned the jury's verdict, not based on problems of proof regarding the handling of the asbestos or the lies, but instead based on an erroneous reading of the scientific requirements of sampling and analysis. In so doing, the district court created a new rule regarding the admissibility of samples, a rule that has profound implications for government enforcement efforts in the future. For the lower court, the only clearly admissible sample would be a sample that was directly proven to contain all layers of the original material in its original proportion. Let me, let me. So the district court here granted a motion for a new trial. Is that correct? That's correct. All right. Now, generally in a situation like that where the district court has presided over a lengthy, complex trial, it's kind of an odd situation for a district court judge to grant a new trial unless they felt or determined or concluded. Fundamentally, the defendants didn't get a fair trial. And our standard of review is pretty demanding. Just try and capsulize for me where the district court judge went wrong in that assessment. The district court judge went wrong by failing to fully comprehend the regulatory scheme, which contemplates the use of debris samples. The district court went wrong. So you had, the government had to prove essentially two, two critical facts, correct? That the, that the asbestos was friable. Right. Right. And that it contained more than one percent for the sample, whatever it is, the material contained more than one percent asbestos, right? That's right. Okay. It didn't look like the friability was of concern to the district court. Is that right? The friability was not a concern. And in fact, you know, the interesting part was that the defendants had disputed the friability right up to trial, and then the evidence of friability was overwhelming. Okay. So that The only time that they brought up the one percent was in October of 2007. That's when it came up for the first time when someone challenged whether or not it was one percent or not. So the testing seemed to have been the whole, the major issue for the district courts from the beginning through the end. Is that right? The sampling and analysis, yes, is the issue. And from the government's perspective, the court has simply misread the regulatory scheme in not permitting the admissibility of the debris samples because the use of debris samples is specifically included in the regulatory structure here. The court also failed to read the credible evidence rule, and the court's ruling is contradicted by substantial precedent across a variety of areas that would allow circumstantial evidence as proof, because the court insisted that the government provide direct evidence that each of the samples that were admitted be representative of all layers of the material before it would be admissible. And, in fact, circumstantial evidence is permitted to allow that. Well, I gather there were a variety, there were different kinds of samples. That is, it's hard to pick, you know, reading the transcript and reading the briefs and whatnot, to get a real flavor for what the samples looked like or were consistent, it's difficult to imagine. But I imagined some of the samples were actual pieces of the wrap that you could see and handle and whatnot, as well as polarized debris that came from the machine cutting it off. Is that right? That's correct. And I'd ask this court, before you decide this appeal, to take a look at three photographs that I've included. I included lots of photographs in the excerpts, but look at 3142, 3149, and 3507, because 3142 is a picture of the machine, the conveyor belt that leads from the machine to the dumpster, the next shot is a picture of the debris in the dumpster, and the final shot is a picture of the debris photographed as it arrived in the laboratory. So you can see what it looked like. There were some samples that were taken initially that were samples of the material that was still on the pipe when it was a chunk of material. There were other samples that were taken of the debris. But the samples that were taken of the material on the pipe ultimately were either crushed into the debris form or homogenized in the lab to become this sort of debris form before they were analyzed. You know, I understand what you're saying about the regulatory scheme and such, but just thinking scientifically, science does work something like computer science, sort of garbage in, garbage out. How in the world, if one doesn't use tremendous care, which I think the regulations suggest one should, in collecting the sample, how in the world does one make the percentage determination in a scientifically appropriate way? Because there are two steps in any science. One is you collect it and then you analyze it. So what I'm not understanding is, if the samples are sloppy, then how can one have a lot of confidence in the result if the samples are sloppy? Well, I don't think that the samples were sloppy in this case. I think that the testimony from the inspectors was that when they went out and took the samples, the samples were representative of the material that they encountered. They encountered material on the pipe, which they sampled, and they encountered debris that they sampled. But to require the government to prove directly that each sample contained all layers is very difficult because the focus of the inspectors is on the friable material because that's the material that they know is regulated. And the friable material is the material that ends up in the dumpster because that's all that's ground up. But if they're focusing only on the friable material, and I gather that nobody questions that you have ten layers and one layer has, say, 60% friable. People might question it today, but until they played around with the regs. One layer has 60% friable, and all the rest have 100% not, and they're vastly different. If I understand it correctly, you average them somehow or get them together either by weight or by volume and decide whether it really is that thing is 1%. So if the inspectors are focused only on the friable material, of course they're going to get high numbers, but how does that make a scientifically sound analysis? The friable material refers to whether it's crumbly or not. Yes, of course, I know. And so it's not just the asbestos layer that's friable. It's the entire material that's friable or it's not. But I think that circumstantial evidence is still available to the government to prove here because when the pipe went into the machine, it had every layer, all the material on it. It stripped it clean down to the bone, and everything that came off of that pipe ended up in those dumpsters. A representative sample of the material in those dumpsters should be representative of the material on the pipe. It should be representative, and that's … Assume you actually get a representative sample of all the layers. Well, we got a representative sample of the dumpster which contains the material from all the layers of the pipe. So a representative sample of all the material should be a representative sample of the material on the pipe. And what we found is that the results were consistent. I mean, the scientific method here actually proved out because the results of the sampling and analysis were consistent throughout. And one of the big errors, I think, that infused the district court's decision was an error of fact. What the district court failed to recognize was that there were two different materials on this site. And I think that this explains this wide variation in asbestos concentration, because there's never been any evidence presented at the trial that the sampling that the government did was not representative. No one testified that our sampling wasn't representative, and in fact, the inspectors testified that it was. The argument that they're not representative is made because of the variety of asbestos content from really high, 50 to 60 percent, down in the 5 to 10 percent range. Well, what we know is that before they went and did this project at all, they sent in their own consultant, SDG and AVID. And that consultant took a sample of two different pipes. And the reason they did that was one pipe, one group of pipes had been put in in 1953, one had been put in in 1955. And they didn't know if the material was the same coating or not, had the same asbestos content. So they sent in a contractor, a certified asbestos consultant, who testified at trial, said that he took a sample of both of those materials, all the way down to the pipe. Took those samples to the same analyst, who analyzed both of those samples on the same day, using the same method. One type of the pipe had 5 to 10 percent asbestos. The other type of the pipe had 50 to 60 percent asbestos. What that shows us, scientifically, is that there's two materials on this site. And so rather than this widely divergent asbestos content being proof that our method is, our methodology is flawed, what it is, is this proof that our methodology is actually correct. Because if you look at all the sample results, all of the sample results uniformly, either are consistent with the 1953 pipe or the 1955 pipe. One or the other. There's nothing that is in between that would suggest that there is some inaccuracy. And what's fascinating is that we were able to do this even with five years difference. Because on January 23rd of 2001, the government took some samples, and there were split samples taken by SDG&E. The SDG&E samples were analyzed in 2001. We didn't analyze those samples until six years later. And yet, our samples for the same spots as the defense samples were within 2 percent for each of those samples in the results overall. That's the scientific type of consistency with the scientific method, where when you do the test more than once and you get the same results, you can rely on that. That shows that our results are reliable, are consistent, and that our samples were either representative of the 1953 pipe or the 1955 pipe. And the district court failed to recognize the two different materials. You can see that because in the initial opinion, when the court talks about why, after going through all the lengthy analysis, why did he decide that he needed to grant this motion? Well, he says because we've got these widely divergent sample results. And when he talks about the samples taken by the Nino and Moore sample in 1999, he refers to those only as the higher asbestos result. He doesn't refer to the lower result. And if you looked at those and thought about them, everything is actually consistent with either the 1953 or the 1955 pipe. And I think that the government is able to prove scientifically and circumstantially that the material was representative and properly analyzed and, in fact, is consistent. And I think that the government is able to prove scientifically and circumstantially Does your position turn on the two clarifications that were issued? No. No, they don't. The two clarifications that are issued aren't before us on this appeal. We're not arguing that before this Court today. Maybe another day, but not here. Okay. And with that, I'd like to reserve. Did you want to address the other issue? Oh, yes. By the way, that. I do want to address the issue of the false statement because I think that the Court has fundamentally erred as well in granting a new trial based on the false statement. The initial opinion, of course, just said, well, you know, the company was convicted and the jury was unable to reach a verdict on Mr. Williamson. And so based on the inconsistency of the verdicts, I'm going to grant a new trial on that count as well. Well, you know, in moving to reconsider, we pointed out that inconsistency of the verdict really wasn't a grounds upon which a new trial could be granted. And at that point, the Court said, well, inconsistency of the verdicts, and based on all the other factors that I've listed above, and the other factors listed above all had to do with the sampling and analysis of the waste material itself, whether or not it was 1% asbestos. Whether or not the material was 1% asbestos has nothing to do with whether or not the man lied about his qualifications as an expert, nothing whatsoever. They are not in any way related, and they stand alone. And if you look at the Court's only rationalizations as being either, well, there were problems with the samples relative to whether they're 1% and there were inconsistent verdicts, really the only thing that relates to the false statement charge that he really has there is the inconsistent verdict. And if this case is allowed to stand on just that, there simply is no limiting, there's no limiting principles for a district court under what's an inconsistent verdict in terms of what will preserve that. And with that, I'd like to reserve. Okay. Please, the Court. Judge Subraw. Let's see, you're Gregory Lawrence Pope? Yes, I apologize, Your Honor. I represent San Diego Gas and Electric Company, and I'll be presenting argument today on behalf of the entity as well as the two individual appellees today. Okay. May I proceed, Your Honor? Yes. Judge Subraw ruled on a narrow ground in granting a new trial, and we ask this Court simply to affirm on a narrow ground. He relied on Federal Rule of Evidence 403. He relied on the fact that he had failed to conduct a Rule 104 hearing regarding the admissibility of test results and samples that he had originally contemplated. And he determined in a case in which he dismissed the government's conspiracy count, which was the heart of its case, the centerpiece of its case, at the end of the government's case in chief under Rule 29, he determined that a profoundly unfair result had obtained with the jury's guilty verdicts on the three Work Act practice counts as well as the false statement count against San Diego Gas and Electric Company. And under Rule 33, under the miscarriage of justice standard, exercising his discretion, subject to the very strict standard of review that this Court, Your Honor, has identified, he granted the new trial. Now, the government says it can use debris samples. We don't dispute that it can use debris samples. It simply needs to prove they're representative. And it didn't do that here. How did they do that? With debris samples. For example, one can hypothesize that material is taken off the pipe and an inspector identifies debris samples lying on the ground and says, you can have a series of affidavits with the chain of custody saying, this is precisely how the material appeared on the pipe. I was an eyewitness to this. I took the debris sample. I gathered it. I put it in a bag. It had the wrap on the nine miles of pipe, the 120 tons of wrap on the nine miles of pipe that were on site, available to the inspectors. The debris sample that I found has seven layers. The pipe wrap on the pipe has seven layers. It appears to be substantially identical to that. And then they bag it and they send it to the laboratory. One can hypothesize a series of facts, evidence that the government could show, to sufficiently prove that a debris sample is representative. But that simply wasn't done here. What was done here? What was done here? How was the evidence presented here? Well, the evidence, this was one of the points about the Rule 104 hearing, that if you look at page 422 of the trial transcript, counsel for San Diego Gas and Electric said to Judge Sabraw, you have to start with representative samples. This goes to Judge Fernandez's point. You have to start with representative samples or else these words weren't used, but garbage in, garbage out. That didn't happen. And I think after the trial, Judge Sabraw realized that that should have happened. He didn't cite Rule 104 in his new trial order, but he quite candidly said that those issues should have been addressed and were not. So what the government was assuming, I believe, was that the debris samples could simply be used to show the content of pipe wrap and that the defense could argue that those artificially inflated numbers, like 60 percent, 50 percent, for example, go simply to the weight of the evidence. Now, the defense was otherwise hamstrung by not being able to say that all this was tested under the wrong method, which was the basis for the district court's dismissal of the first indictment. This goes to the clarifications point. The EPA had issued clarifications that directly contradicted the law itself had created. And that, in fact, I believe is why the parties involved in this case, the regulated persons, didn't challenge the sampling results based on multilayer averaging because everybody was following the incorrect EPA clarifications. It was only when a criminal indictment of three people and a company was returned by a grand jury in this case that the focus started to be on the 1 percent. And at that point, it became quite evident there was a serious problem here with the 1 percent. For example, the one sample, SD2, that was fairly litigated at trial was, the defense evidence was compelling that it was under 1 percent. And Judge Sebrost said, look, that preponderated against the verdict. And what you had other than that was all sorts of test results based on non-representative samples that were argued to the hilt in closing by the government, saying you don't have to rely on the government evidence on this SD2 sample, recognizing that the defense evidence was compelling. You can rely on all these other samples, all these other test results, 60 percent, 50 percent, overwhelming prejudice. And that was the basis under Rule 403 for Judge Sebrost's ruling. Now, I would like to get to the false statement, excuse me, account for a moment, because Judge Sebrost cited all of the leading case law. He cited Dodderwhite. He cited Hughes Aircraft, the leading case in the Ninth Circuit. He cited Powell, the leading case in the United States Supreme Court. He knew what the law was. What Judge Sebrost was identifying was, by referencing the inconsistent verdict, it's not a legal conclusion, but a fact that made him uncomfortable. Within the scope of his determination under Rule 33 was something, a miscarriage of justice. And I profoundly disturbed in my heart as a judge presiding over a trial from beginning to end, Judge Sebrost found that that result simply couldn't stand. Now, the evidence for that result he also referred to. The question is, is the pipe regulated? Is the wrap regulated? Judge Sebrost, the false statement made allegedly by, and Mr. Williamson was not an SDG employee, by the way. He was an employee of the parents, Semper Energy. The alleged false statement was, according to the government, to avoid regulation. That's what the test results were all about. Is this material regulated? The issues in front of the jury were, is this material regulated? I thought the false statement was that he was a certified asbestos consultant. That was the false statement. I'm probably being unclear, Your Honor. The government argued that his motive was to make a false statement in order to try to evade regulation, and that SDG was vicariously liable for that alleged false statement. What Judge Sebrost recognized was, look, in a case in which a conspiracy theory and the evidence that came into it was completely insufficient to go to the jury, he dismissed that on Rule 29. He said test results were unfairly argued. One issue, these are all going to the core issue. Is the material regulated? And the jury can't neatly separate out this information as the government would have this court determine. If the court is at all uncomfortable, I should add, on Judge Sebrost's determination on the false statement count, there's a middle step, which is simply to ask him what he meant by referring to inconsistent verdicts. It's just a limited remand for that sole purpose. But we're not asking the court to do that because we don't think it's necessary. With respect to the, so let me give you another example, by the way. At page 4923 of the trial transcript, the government argues to the jury in closing that SDG&E skimped on testing in not getting some follow-up testing performed on the so-called JMR samples. And its argument, again, at that level of generality, is this material regulated, saying SDG&E is bad for not doing proper testing. SDG&E is bad for having an employee who makes a false statement. The material is all regulated. One cannot separate out the false statement count from the work practice counts, as the government itself correctly identified before trial when it moved for joinder, on the grounds that all of the information was inextricably intertwined. Miss, was it, let me just, were any of the samples produced at trial? Three samples were, Your Honor. Which ones were they? I believe, well, SD3, SD4, and SD5, which were three of the samples taken by Inspector Trotter, the EPA Region 9 inspector on January 23rd of 2001, and two additional samples, I believe, were also introduced into evidence at trial physically. But I can't recite to the Court off the top of my head which two those were. But there were samples introduced at trial, but none of them were deemed representative. And none of them were argued to be representative. They were debriefed. When you say none of them were deemed representative, what do you mean by that? Well, the parties didn't, there was no finding that they were representative samples. Our position is that they were not representative samples. Well, I guess only the Court could have made a finding that they were representative samples. Again, that was the, unfortunately, the Rule 104 hearing had been contemplated and it did not occur or would have determined that. Because if you look at page 422 of the trial transcript, the defense said representative samples need to underlie any testing, Your Honor. That's why we need this Rule 104 hearing. And it didn't happen. And then Judge Subraw granted. Having been through the trial and watched the evidence. So none of the witnesses got up on the stand and said these samples are all representative? There was not litigation over that issue at trial. That's not my question. Did they get up on the stand and testify that these samples are representative of the wrap around the pipe? I don't mean to not answer Your Honor's question directly. I'm sorry. There was testimony by Mr. Sherman, who was the government's first witness, regarding two early samples, regarding, for example, that he took, he penetrated, I don't think that was his word, but he went down to the pipe. Now, an inference arguably could be drawn that those were representative samples. And I think that's what Judge Subraw contemplated if he's affirmed having a Rule 104 hearing on. But there was not testimony, to answer Your Honor's question, that this sample is representative in a way that conforms with the regulation. With none of the three? None of the three samples that were introduced? There was no testimony that they were representative? Those physical samples, Your Honor? No. That is correct. Was there cross-examination on that issue? There was cross-examination on that issue and many others relating to it. If the person who took the sample said, well, he went down to the pipe, we got all the layers, and here it is. This is it. This is Exhibit 3. Why isn't that representative? Well, it could be under certain circumstances, but there's an additional problem that Judge Subraw identified, which is those two samples that Mr. Sherman, the first witness, testified about, by the time they got to the lab, the lab analyst said he treated it as if it was one layer. So there was no multiple-layer testing. So even on those two so-called Ninho and Moore samples, which are arguably representative, the testing method was incorrect. And Judge Subraw recognized that in his new trial order as well, and that would have been another issue that the Rule 104 hearing would have addressed. Ultimately, at the end of the trial, did the judge instruct on what was representative, a definition of representative? He did not. He did not instruct on the test method. He gave jury instructions about the element of the crime that was charged. What were the essential elements? Friability, 1% asbestos content, under the method specified in the regulation, and the level of mens rea requirement, essentially knowledge that you're dealing with an asbestos removal project, at that level of generality, which was a disputed issue. But that was the instruction that went to the jury. So he didn't instruct that the samples had to be representative or that the samples had to meet a certain testing methodology. That's correct, Your Honor. He essentially left it up to the jury. Could you ask him to instruct on those items? Yes. There was a request for a defense instruction about what the controlling test method should be, and that was rejected. And, again, I think it's implicit in Judge Subraw's grant of a new trial that this case, there were issues that were not addressed in this case that should have been, and he couldn't let the verdict stand, knowing that those issues had not been addressed during the course of the trial. He determined that the probative value, whatever it may have been, of these test results based on non-representative samples, was substantially outweighed by the danger of unfair prejudice. Explicit balancing held that a Rule 104, he didn't say it specifically, but in effect, said it should have occurred but did not, and that as a result, the verdict couldn't stand because on the one sample, the SD2 sample, that was fairly contested, the defense results were compelling under 1%. The government's witnesses on that made a number of assumptions that the jury could have gone either way on, but the point was Judge Subraw said that preponderates against the verdict. The rest of this just overwhelmed it. It poisoned it. That's my word, poisoned it. Now, I do want to mention just the credible evidence rule. The government, you don't, the court doesn't have to reach the credible evidence rule. The government, it can mean everything the government wants it to mean, and EPA itself in its final rulemaking in 1997 said, this has nothing to do with the federal rules of evidence. That, you know, if I point the court in particular to page 8323 of 62 Federal Register, where it says, of course, in judicial enforcement proceedings, what evidence is credible and admissible will be determined by the court, taking into account how the evidence was gathered and the specifics of the emission standard. Note, that doesn't even go to work practice standards. So this is assuming it applies to work practice standards, which is what was charged in this case. The specifics of the emission standard and any associated reference method, that's 62 Federal Register 8323. I gather the issue of friability sort of dropped out of the case as a contentious matter, you know, that was disputed. I don't think it's, I don't think it dropped out of the case. For example, I mean, there was.  That was not an issue that really concerned Judge Sabra when he granted the new trial. Well, in the context of the new trial order, he rejected it on the Rule 29 motion post-trial. He believed that there was sufficient evidence to show. Seems like it. I think the evidence was hotly disputed about whether the material was friable. I mean, this was a transparent operation. This site sits, it's surrounded by three hills with residences. The Massachusetts Avenue, I believe, in San Diego runs by it. It's a freeway-like avenue with the trolley that runs behind it. This was open to all. The matter was handled transparently by the company from beginning to end. And the issue of friability was something that was talked about over and over with inspectors who were on the site from beginning to end. And so I believe while Judge Sabra ruled that the Rule 29 motion should be denied, I don't think it – I certainly wouldn't want to say it wasn't a hotly disputed issue, a friability issue. Unless the Court has any additional questions. I don't hear any. Thank you. Thank you. I believe the government had some time for rebuttal. Thank you. I was deeply concerned to hear his description of the type of samples that the government could use debris samples for because in saying that if we could get an inspector out there who gathers a chunk that says that it fell off the pipe and that she could see all seven layers in it and bag it, that would be a sample that we could use. That simply doesn't get us there in an enforcement effort where all that they find is a dumpster full of crushed up stuff from the machine at the end. Moreover, it simply doesn't recognize the reality of field work. An investigator, an inspector who's out there with a full-face respirator who picks up a chunk of material on the ground can't see seven layers in it, can't see them. She can look at it and say this stuff is the same color and texture as this material and it appears to be about as thick as it. But can I tell you beyond a reasonable doubt that it's got every layer? It's laying on the ground now. I think it is. And what we had was an inspector who did just that. In this case, Inspector Weir went to the site and she gathered samples from the base of a pipe stockpile. She gathered some from beneath the pipes, chunks of material that came up. She also gathered debris off the machine, from the dumpsters, from the conveyor frame, and sampled all of those. And she testified at trial with no contrary testimony. So then what did the regulations require her to do with that, with those samples that you just described? The regulations require her to take a representative sample of all of them. You just said she took samples. You just said it. What was she required to do with it under the regulations? She was required to mark them, bag them, and have them analyzed, which she did. Okay. And what was the methodology used to analyze them? The methodology that was used to analyze the Weir samples, the inspector's samples, was that it went to the laboratory. The laboratory observed some layers in the materials that they were given. However, this particular analyst didn't feel that she was capable of separating the layers. So what this particular analyst did was ground them all up, homogenized them in the lab, and then analyzed it as if it were a single layer, which is, in fact, permissible under the regulations. And even the defense expert at trial agreed that if an analyst felt that they were unable to separate the layers. So the regs allow in the lab for the analyst to take the sample and crush it up? It describes the mortar and pestle, the milling that an analyst can do. That's in the regulation itself. It says that if you're having trouble separating the layers, that you're allowed to do that. And it talks about it's at the preference of the analyst. And this analyst was able to do that. And, in fact, Mr. Van Orden, the defense expert, testified that that was proper if an analyst couldn't do that. Similarly, Mr. Van Orden agreed with the government that if an analyst was handed a sample in which he observed no layers, then a simple, straightforward analysis of pinch mounts was proper. That's what happened with the two Jerry Sherman samples, the two samples from the Ninho and Moore. He took them. He cut them down to the pipe. What he testified is that he crushed them in his hands because that's the test for friability. So he had to crush them. He said he crushed them to dust and carried the two bags of dust to the lab. By the time it got to the lab, the analyst couldn't see any layers. He didn't think of taking another cut from the pipe? That wasn't how it was done. He took the sample and handed it to the laboratory. But the analyst and the analyst... I gather at the time all this was taking place, when construction or when demolition stopped, that there was plenty of pipe with wrap still in existence. Is that right? There was. There was lots of... Lots of pipe and lots of wrap. Lots of pipe around. How long? Nine miles or something? Quite a... Yes. Right. Tons and tons of asbestos wrap on that pipe. There was lots of it. But at that point, the EPA clarification methods were still being referred to by everyone, and so everyone believed that... Plus, let me just say, there were 75 samples of this material taken before trial. Seventy-five samples that all tested over 1%. And no one argued at that time that it was less than 1% that we hadn't fairly done this or we simply would have gone out and taken more. But I think that you have to look at what... Let me go back just to the facts here. Both... When we got the... There were samples that were absolutely clearly representative, were the Sherman samples down to the pipe and the Trotter samples. Mr. Trotter, the EPA analyst, when he goes down there and takes SD2. And Mr. Williamson took a sample that day from the pipe as well and turned it in. Mr. Williamson didn't testify, obviously, as a defendant. He has that right. So we don't have testimony that we can present that will say that it was down to the pipe. However, we do have testimony that they were attempting to replicate the samples taken by Mr. Trotter that day. So I think it's a fair circumstantial inference. You need to wrap up, okay? Okay. What I want to say is that the sampling done by the defense expert and the government's expert with regard to just the asbestos layer for the samples that they looked at was in the same range, 30 to 40%. However, we have samples that are 50 to 60%. That shows that those samples are a different material because you can't get 50 to 60% out of 30, 40%. You just can't. And so because there are two materials on there, our samples are representative, our results are consistent. Thank you. Thank you. We appreciate the arguments from both sides. This case is submitted for decision. And that ends our session for today.
judges: Goodwin, Fernandez, Paez